**Harvey L. THOMPSON, Jr., Appellant,**

v.

**PRESTON STATE BANK, Appellee.**

**No. 19637.**

Court of Civil Appeals of Texas, Dallas.

Nov. 6, 1978.

Rehearing Denied Dec. 6, 1978.

John A. George, Dallas, for appellant.

T. Michael Wilson, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellee.

GUITTARD, Chief Justice.

Preston State Bank brought this suit on a Master Charge account against the cardholder and the guarantor. The trial court, sitting without a jury, rendered judgment against both the holder and the guarantor for $931.35. The guarantor appeals on the ground that the amount of the credit extended by the bank exceeded the amount applied for before the guaranty was signed and before the card was issued. He also denies his liability for "finance charges." We hold that the guaranty is not limited to the amount of the credit applied for, but that the guaranty by its terms covers only "purchases" and not "finance charges." Accordingly, we modify the judgment by deleting the finance charges, and also certain charges to the account after notice of revocation by the guarantor, and as so modified, we affirm the judgment.

The guarantor, Harvey Thompson, was the father-in-law of George Clifton, to whom the card was issued. When Clifton approached the bank for a Master Charge card, he was told that he would need a guarantor of the account. The bank furnished him a form of guaranty, on which he obtained Thompson's signature. The guaranty is as follows:

> In consideration of your extending a Presto/Master Charge account to George L. Clifton, I guarantee absolutely to pay in Dallas, Dallas County, Texas, for all purchases made on the account. This agreement is a continuing one, revocable only by me in writing received in your office. You need not first proceed against the above before resorting to me for payment.

Clifton submitted this guaranty to the bank, together with his application on a printed form for a Master Charge credit card. The application contains a "cardholders agreement," which provides that the "Customer" (holder):

> . . . authorizes Issuer to extend credit to or for the account of Customer to the extent necessary to pay for (i) all purchases of goods, other property, and services made at any time through the use of the Card, from any seller authorized to honor the Card ('Credit Purchases'), and (ii) all cash advances obtained at any time, through the use of the Card, from any bank authorized to honor the Card ('Cash Advances').

The agreement further provides:

> Customer promises to pay to Issuer in Dallas, Texas the entire amount of all credit extended hereunder and all FINANCE CHARGES and other charges incurred under the provisions hereof.

With respect to the amount of credit to be extended, the agreement provides:

Customer has been informed by Issuer of the maximum amount of indebtedness which may be outstanding at any time with respect to the Account (which maximum amount is made a part of this Agreement), and Customer agrees not to make any Credit Purchases or obtain any Cash Advances which would cause the outstanding balance in the Account to ever exceed such maximum.

The application form contains a blank space for "Amount of credit desired." In this blank was written "$400." However, when the card was issued in October, 1973, the bank advised Clifton that the credit limit was $200. No communication occurred between the bank and the guarantor Thompson before the credit card was issued. The guarantor was advised, apparently by Clifton, that the credit limit would be $400.

Although the balance of the account ran over $200 in December 1973 and February 1974, the bank notified Clifton in March 1974 that the credit limit was raised to $400. In August 1974 the balance reached $532.07, but in September a new card was issued. After August the balance each month exceeded $400, and in December 1974 it rose to $927.58. On December 26, the bank received a written revocation of the guaranty from Thompson. In January and February 1975 additional purchases were charged to the account, and thereafter finance charges were added. Clifton paid $75 and Thompson made payments aggregating $400. After allowing these credits and adding finance charges through January 1976, the bank demanded payment of a balance of $931.35. Receiving no further payments, it sued for that balance. Judgment in that amount was rendered against both Clifton and Thompson.

■ Thompson contends that he was discharged from his guaranty by the bank's actions in increasing the credit without notice to him, in allowing Clifton to make additional purchases above the credit limit, and in reissuing the card when the account was in default. These actions, he argues, constitute a material and a substantial modification of the guaranty agreement and were prejudicial to his rights.

We do not agree that the bank's actions discharged Thompson from his guaranty. The guaranty contract is absolute and unlimited. If we construe the guaranty together with the credit application, as Thompson urges us to do, we still find no obligation on the part of the bank to limit the amount of credit extended. The customer agrees to limit purchases to the amount specified by the bank, but the bank does not agree to limit the credit to any amount. The maximum is a matter within the bank's discretion. On issuance of the card, the bank did not accept Clifton's request for credit up to $400, but advised him that it would allow him only $200. Later it advised him that the amount was raised to $400, but it allowed him to run balances greater than that amount.

The guaranty, if referable to the agreement between Clifton and the bank, guarantees all amounts for purchases charged to the account by Clifton under the agreement, whether or not such purchases are within the maximum specified by the bank. Consequently, in extending credit beyond the maximum specified, the bank made no change either in the guaranty agreement or in its contract with Clifton. Neither does the bank's negligence in extending more credit than the stated maximum afford a defense under the absolute and unconditional terms of this guaranty. *Ganado Land Co. v. Smith,* 290 S.W. 920 (Tex.Civ.App.—Galveston 1927, writ ref'd).

Alternatively, Thompson argues that the amount of the guaranty should be limited to $400 because that was the amount of credit that Clifton originally requested. We cannot agree. This $400 request was not accepted by the bank, which initially allowed only $200. Although the bank later notified Clifton that the maximum was raised to $400, it never agreed to limit the credit to that maximum. Clifton's agreement that he would not charge purchases in excess of the maximum stated by the bank does not imply a corresponding duty on the part of the bank not to extend the credit beyond the maximum. Consequently, the

$400 maximum never became applicable as a contractual limitation on the amount of Thompson's liability on the guaranty.

Thompson also contends that he is not liable for the finance charges provided in the agreement because his liability is limited by the terms of the guaranty to "purchases." The bank replies that the guarantor's obligation to pay "for all purchases made on the account" includes also the finance charges specified in the cardholder's agreement because such charges, as well as the purchase prices of the various items, are charges "for purchases" if the amounts of the purchases are not promptly paid. The bank distinguishes "purchases" from "cash advances," and argues that although cash advances might not be covered by the guaranty, finance charges on past due amounts charged for purchases are within the guaranty.

■ We do not agree that the finance charges are guaranteed. The terms of this guaranty are not broad enough to cover all amounts due on the account. A finance charge is not made pursuant to the contract between the purchaser and the seller, but is made by the bank under the cardholder's agreement because of the purchaser's delay in paying the bank the amount of the purchase price which, presumably, the bank has already advanced to the seller. A guarantor's obligation should not be extended by implication beyond the written terms of the agreement, and any ambiguity should be construed in favor of the guarantor. *Commerce Savings Association v. GGE Management Co.*, 539 S.W.2d 71, 78 (Tex.Civ.App.—Houston [1st Dist.] 1976), *modified and aff'd*, 543 S.W.2d 862 (Tex.1976); *Southwest Savings Association v. Dunagan*, 392 S.W.2d 761, 766–67 (Tex.Civ.App.—Dallas 1965, writ ref'd n. r. e.). Moreover, since this guaranty was on a printed form provided by the bank, any ambiguity in a printed contract should be construed most strongly against the party who selected the language. *Amory Mfg. Co. v. Gulf, C. & S. F. Ry. Co.*, 89 Tex. 419, 37 S.W. 856, 858 (1896); *Pledger v. Business Men's Accident Ass'n of Texas*, 228 S.W. 110, 113 (Tex.Com.App.

1921, *jdgmt. adopted*); *Monesson v. Champion International Corp.*, 546 S.W.2d 631 (Tex.Civ.App.—Tyler 1976, writ ref'd n. r. e.). The term "purchases" in this context is, at best, ambiguous. Consequently, we construe the guaranty as not extending to the finance charges provided in the cardholder's agreement.

■ We do not hold, however, that the guarantor has no liability for interest. From the time his obligation to pay arose, he is liable for interest at the legal rate from the date of his default. *Commerce Savings Association v. GGE Management Co.*, 539 S.W.2d 71, 78 (Tex.Civ.App.—Houston [1st Dist.] 1976, *modified and aff'd*, 543 S.W.2d 862 (Tex.1976). Prejudgment interest, however, must be based on a proper pleading. *Black Lake Pipe Line Company v. Union Construction Company*, 538 S.W.2d 80, 96 (Tex.1976). In the present case, the bank has neither alleged nor proved any facts establishing the amount of Thompson's liability for prejudgment interest.

■ Finally, Thompson contends that the trial court erred in its computation of the amount of damages recoverable from the guarantor because of amounts charged to the account after the bank received notice of revocation of the guaranty. This point also is well taken. At the time of the revocation on December 26, 1974, the outstanding balance was $927.55. Although some of the later charges may have been purchases for which the bank advanced its funds before it received the revocation, the record contains no proof in this respect. Since the bank had the burden, these items must be disallowed. Consequently, Thompson's liability is limited to the outstanding balance of $927.58, less subsequent payments of $400 by him and $75 by Clifton, leaving a balance of $452.58, with interest at the legal rate from the time Thompson's obligation to pay matured.

The judgment of the trial court is modified by reducing the amount of the recovery against Thompson to $452.58, as so modified, the judgment is affirmed. The judgment against Clifton is not disturbed. Costs are equally divided.

Modified and affirmed.